# IN THE COURT OF APPEALS OF IOWA

No. 24-0406
Filed October 29, 2025

**STATE OF IOWA,**
      Plaintiff-Appellee,

**vs.**

**DANIEL ANTHONY LANG,**
      Defendant-Appellant.
_____

Appeal from the Iowa District Court for Scott County, John Telleen, Judge.


A criminal defendant appeals his conviction for sexual abuse in the second degree, and the State asks this court to overrule *State v. Smith*, 508 N.W.2d 101 (Iowa Ct. App. 1993).  **AFFIRMED.**


Jack Bjornstad of Jack Bjornstad Law Office, Spirit Lake, for appellant.

Brenna Bird, Attorney General, and Sheryl Soich, Assistant Attorney General, for appellee.


Considered en banc without oral argument.  Telleen, S.J., takes no part.

**BULLER, Judge.**

In this appeal by Daniel Lang, we confront a ghost from our court's past—*State v. Smith*, 508 N.W.2d 101 (Iowa Ct. App. 1993). There, a divided panel of our court vacated a jury verdict and reversed Smith's convictions for sexually abusing three children based on the panel majority's view of the child victims' credibility. Since then, *Smith* has been routinely criticized by our court and the supreme court; it has never been followed; and its specter haunts our case law, perpetuating myths or false beliefs about the dynamics and law surrounding sexual abuse. Despite this, Lang invokes *Smith* in a bid for us to once again invade the province of the factfinder and vacate the guilty verdict resulting from his bench trial. We take this opportunity to overrule *Smith* and exorcise the decision from our precedent. Lang's convictions were supported by substantial evidence and multiple credibility findings, so we must affirm.

### I.     Background Facts and Proceedings

Z.S.'s mom started dating and moved in with Lang shortly after Z.S. was born. Lang is not Z.S.'s biological father, but he acted as a self-described "father figure" to her throughout her childhood during his on-again-off-again relationship with her mom. Z.S.'s mom and Lang later had their own child, who was raised in the house with Z.S. Two of Lang's other children sometimes lived in the house. And those children grew up with—but did not always live with—Z.S.'s older sister C.H., who mostly lived with her dad.[1]

---

[1] Although she was not a charged victim, we refer to C.H. either by initials or as "Z.S.'s sister" to protect her privacy.

In July 2022, then-seven-year-old Z.S. disclosed to then-twelve-year-old C.H. that Lang was sexually abusing her. The core of Z.S.'s report was that Lang put his private parts in her "butt area" and her mouth. C.H. recalled that Z.S. "seemed scared" when she described the abuse, and C.H. told Z.S. she needed to tell an adult. That same day, Z.S. told her dad and his girlfriend, who called the police. When telling her dad what happened, Z.S. described abuse involving her "mouth" and "private parts on private parts."

Z.S. was forensically interviewed at the child protection center in Muscatine. Z.S.'s dad testified that he and his girlfriend did not discuss the abuse with Z.S. before they went to the interview or medical examination, and the district court believed him—"find[ing] absolutely no support for an argument that [Z.S.'s father] somehow ginned up or encouraged false allegations by [Z.S.]."

During the forensic interview, Z.S. described and demonstrated what she meant by "private parts." She said she had seen Lang's private part and that "he does really bad stuff to me." She said Lang would take his clothes off, take her clothes off, and put his private part in her mouth. She said this happened more than once in multiple locations and that this and other abuse started when she was around three years old. Z.S. described how Lang would use his private part to "pee" on her private parts and in her mouth. She said he made her "suck on it" and that sometimes he used "lotion something" on their private parts, which made them "wet" and "go back and forth smoothly."[2] She said Lang's private part was "squishy," the "pee" and private part tasted "nasty," and he made her swallow

---

[2] Police later found a bottle of lubricant in Lang's bedroom, consistent with what Z.S. described in the forensic interview.

"every time he put it in [her] mouth." She also explained that Lang put his mouth on the "front" and the "back" of her private parts. He "would like put his tongue and keep going back and forth" and she could hear "licking" noises. And he would "try to kiss" her.

As part of the interview, Z.S. circled anatomical locations where Lang would "pee" or inappropriately touch her: the chest, back, mouth, vagina, and anus. She said she wanted Lang to stop but he didn't. She said the abuse happened "a lot of times." And she said "it hurt," both during the acts and when she went to the bathroom after—both when she went "poop" and "pee."

In trial testimony, Z.S.—then nine years old, in third grade—identified who she lived with, when, and where. According to the district court's fact findings, she "noticeably g[o]t quieter or stiffen[ed]" when she was questioned about Lang. She did not know or use adult anatomical terms for her body. She said private part "number one" was where her "pee" came out and private part "number two" was where "poop" comes out. And she testified that Lang did something to both of her private parts.

Z.S. testified that Lang would take off her clothes, take off his clothes, then put her stomach-down on the bed with her feet on the ground. She described how Lang would stand behind her, then his private part where "pee" comes out would touch her private part that goes "poop." This happened more than once. And she testified that, also more than once, Lang would put his "entire body" on top of her and his "private part that goes number one" (penis) would touch her private part that goes number one (vagina). Using similar language, she described her hand

touching Lang's penis, again more than once. When asked if her mouth touched any part of his body, she said at trial: "Not really."

Z.S. told the court she did not tell her mom about the abuse because she was afraid Lang would hurt her mom. She explained that Lang was "mean," and she had seen Lang hurt her mom before by twisting her body parts and "trying to choke[3] her." Z.S.'s mom confirmed the domestic abuse and "toxic" relationship in her testimony, describing instances of Lang "choking" her and multiple Department of Health and Human Services (HHS) investigations. So did Z.S.'s dad and C.H. Z.S.'s mom also testified that Lang spent time alone with Z.S. during the approximately eight years Lang was in their lives.

Z.S.'s mom confronted Lang after she learned of the abuse, and he denied it. Lang packed up his things and moved out, leaving the children notes that Z.S.'s mother understood to be goodbye messages referring to his guilt and the probability he would not see them again. He soon sent messages to Z.S.'s mother alluding to his guilt and suggesting he might kill himself, and he created what appeared to be a suicide cocktail. He told arresting officers that "his life was crashing down" and he "was contemplating suicide" by poison. The district court found it "notable" the messages and statements did not include denials of the abuse.

---

[3] We use the word "choke" and its derivations because those were the words used by witnesses at trial. However, we note the correct terminology would be "strangled" given the witnesses' description of the act. *See* Mary Pat Gunderson, *Gender and the Language of Judicial Opinion Writing*, 21 Geo. J. Gender & L. 1, 11 (2019) (on how language matters and noting that describing acts of strangulation as "choking" can minimize or mitigate the perpetrator's actions).

An inmate who was formerly housed with Lang at the county jail testified that Lang told him he was in jail for sexual assault charges, that Lang described himself as a "piece of shit" who was "never going to see his kids again," and that Lang said he would be facing additional charges if police spoke to his other children. Lang eventually gave the inmate more details about his victim, including Z.S.'s name, that she was his girlfriend's daughter, her age, and that the abuse had been going on for more than three years. Lang told the inmate he started abusing Z.S. to get back at Z.S.'s mother. And Lang eventually described specific sex acts to the inmate, including that he masturbated with Z.S. on top of him, performed "oral sex" and "penetration," and that he set up cameras to record her with the purpose of selling child pornography online. The details were so graphic and specific the inmate started taking notes with the goal of sharing information with law enforcement. Although the inmate entered into a cooperation agreement with the county attorney, he ultimately was sentenced to prison on his pending charges before trial. The district court credited the inmate's testimony because the inmate "had nothing to gain" and "[t]he court believed him when he stated he just thought it was the right thing to do." Police also independently corroborated some of the inmate's testimony with Lang's jail calls, which the inmate overheard and later described.

A pediatrician specializing in child abuse explained at trial that, although no acute physical injuries were found during a medical examination of Z.S., this was not inconsistent with Z.S.'s report of sexual abuse.

The defense called a different child protection center employee to testify that Lang brought a different child to the center based on some sexual behaviors.

And HHS workers testified that Z.S. did not spontaneously disclose the abuse when they were investigating the family for other reasons. Lang testified to conflict between him and Z.S.'s mother, including his guilty pleas to domestically abusing her and his uncharged allegation that she domestically abused him. He denied sexually abusing Z.S., making admissions to the inmate, and that the goodbye messages were an admission or confession of guilt. And he cast vague aspersions on other men who might have been around Z.S. during the charged time period. Lang admitted he was planning to attempt suicide when arrested and that he failed to show up for a scheduled police interview. He agreed with his attorney that, in watching the recorded forensic interview, Z.S. appeared to be describing things that were outside the knowledge of a seven-year-old child. And he agreed with the assistant county attorney that Z.S. "appeared to be describing things that she actually experienced and felt with her body." In Lang's words, the forensic interview was "shocking" and "nauseating."

In resolving conflicting evidence and weighing Z.S.'s and other witnesses' testimony against Lang's denial, the district court—in a thirty-four-page written verdict—credited Z.S. and the inmate's testimony and did not believe Lang. Specifically, the court made detailed credibility findings about Z.S. based on her trial testimony and her forensic interview. The court found Z.S.'s forensic "interview as a whole . . . very compelling and credible." And the court found Z.S.'s in-person testimony "very credible," concluding she "did not at all appear to exaggerate nor was there any questioning to indicate that [an] adult was putting words in her mouth." "The court was convinced [Z.S.] knew very well the difference between a truth and a lie. The court was alert for any signs that her father, mother

8

or anyone else had put her up to telling stories and the court [found] there was no indication of that." In sum, the court was "of the very firm opinion" that Z.S. described sexual abuse and "that sexual abuse in fact happened to this little girl." The court found Z.S.'s report of abuse "to be entirely credible" and discerned no pressure or coercion affecting her testimony.

In weighing Lang's testimony, "[t]he court did not find his denials remotely convincing." And the court expressly rejected defense theories that Z.S. was coached, that Z.S. shouldn't be trusted because she didn't disclose earlier, that Z.S. confused sexual abuse perpetrated by another offender with acts committed by Lang, and that the lack of acute physical findings undermined Z.S.'s account. The court also considered whether allegedly "inconsistent" statements by Z.S. warranted acquittal, and the court noted it was "not surprised that her testimony in an intimidating courtroom with a judge in a black robe might be somewhat different than the details provided to a trained social service worker in a more comfortable setting."

The court found Lang guilty of three counts of sexual abuse in the second degree, class "B" felonies in violation of Iowa Code section 709.3(1)(b) and (2) (2022). And the court sentenced Lang to prison. He appeals, challenging only the sufficiency of the evidence supporting his conviction.

## II. Standard of Review

We review sufficiency-of-the-evidence claims for correction of errors at law. *See State v. Jones*, 967 N.W.2d 336, 339 (Iowa 2021). "In determining whether the [factfinder]'s verdict is supported by substantial evidence, we view the evidence in the light most favorable to the State, including all 'legitimate inferences and

presumptions that may fairly and reasonably be deduced from the record evidence.'" *Id.* (citation omitted). We do not require corroboration of victim testimony, nor do we substitute our view of the evidence for that of the factfinder. *State v. Hernandez*, 20 N.W.3d 502, 507–08 (Iowa Ct. App. 2025) (en banc).

### III. Discussion

Lang frames the sole issue on appeal as: "Were [Z.S.]'s testimony and statements self-contradictory and absurd to the point that they could not convince a rational fact finder that Lang is guilty beyond a reasonable doubt?" The lynchpin of his argument is *State v. Smith*, 508 N.W.2d 101, 103 (Iowa Ct. App. 1993). In response, the State of Iowa urges "*Smith* should be overturned and left in the ash heap of history: it permits defendants to perpetuate arguments that are both legally unsound and unsupported by our modern understanding of sexual abuse victims." We consider first the vitality of *Smith*, then Lang's sufficiency challenge.

### A. Revisiting *Smith*

According to the State's brief, "*Smith* has been widely panned" by our court and the supreme court. We agree.

In recent years, the supreme court has described *Smith* as "an outlier case" that "has been criticized in the commentary, and it has not been followed in any sexual abuse case in Iowa since." *State v. Mathis*, 971 N.W.2d 514, 518 (Iowa 2022). That court went on to opine that the "primary flaw" in *Smith* was a misapplication of the standard of review when this court substituted its judgment for the jury's verdict rather than deferring to it by viewing the evidence in the light most favorable to guilt. *Id.* In another decision, the supreme court repeated this criticism, describing *Smith* as "inconsistent with our appellate standard[s]." *State*

*v. Trane*, 984 N.W.2d 429, 436–37 (Iowa 2023).  And even in decisions that do not overtly swing at *Smith*, the supreme court has employed language irreconcilable with *Smith*'s holding.  *See, e.g.*, *State v. Donahue*, 957 N.W.2d 1, 11 (Iowa 2021) ("[A defendant]'s argument that [the victim]'s testimony is not credible enough to convince a rational fact finder of his guilt beyond a reasonable doubt is unavailing for sufficiency of the evidence purposes.").

The criticism from our court has come from a majority of active and senior judges.  We collected many of these cases in *State v. Showers*, No. 23-0390, 2024 WL 2317709, at *4–5 & n.4 (Iowa Ct. App. May 22, 2024).  We observed:

> Along with our supreme court's directive over the ill-advised use of the *Smith* case, each decision departing from or declining to follow *Smith* is an implicit recognition of the incorrect reasoning employed in that decision.  As our decisions over the last thirty years suggest, we have not returned to the flawed analysis found in *Smith*.

*Showers*, 2024 WL 2317709, at *5.  And we highlight just a few observations from our unpublished decisions that we think are representative of the fundamental flaws we see in *Smith*:

- "In the more than thirty years since it was decided, *Smith* has become an anomaly in our case law . . . ."  *State v. Fairchild*, No. 23-2090, 2024 WL 5153704, at *4 (Iowa Ct. App. Dec. 18, 2024).

- "*Smith* draw[s] on archaic concepts about sexual abuse to support its decision, but it also glosse[s] over the gatekeeping concepts that must frame our analysis."  *Showers*, 2024 WL 2317709, at *5.

- "[O]ur supreme court has flagged *Smith* as 'an outlier case' because it flouts the deferential appellate review of verdicts and the factfinder's resolution of disputed factual issues."  *State v. Duran-Sierra*, No. 21-1312, 2023 WL 2148743, at *2 (Iowa Ct. App. Feb. 22, 2023) (citation omitted).

- "[W]e view any reliance on the limited exception mentioned in . . . *Smith* to be shaky at best."  *State v. Lopez Escoto*, No. 24-0744, 2025 WL 2058047, at *2 (Iowa Ct. App. July 23, 2025).

Perhaps most telling on *Smith*'s vitality, we have now been asked to apply *Smith* when reviewing convictions more than eighty times, and we have never applied that case to reverse a conviction. *See Showers*, 2024 WL 2317709, at *5 n.4 (noting seventy-seven cases declining to follow *Smith*); *see also State v. Davis*, No. 24-0837, 2025 WL 2803725, at *2 (Iowa Ct. App. Oct. 1, 2025); *Lopez Escoto*, 2025 WL 2058047, at *2; *State v. Sahr*, No. 23-1920, 2025 WL 2057913, at *2–3 (Iowa Ct. App. July 23, 2025); *State v. Shogren*, No. 23-2085, 2025 WL 1704077 at *5 & n.5 (Iowa Ct. App. June 18, 2025); *State v. Brown*, No. 23-2127, 2025 WL 1177589, at *4 (Iowa Ct. App. Apr. 23, 2025); *State v. Fisher*, No. 23-1140, 2025 WL 400511, at *2 (Iowa Ct. App. Feb. 5, 2025); *Fairchild*, 2024 WL 5153704, at *4.

Our court has questioned "whether *Smith* even remains a viable precedent." *State v. Ross*, No. 20-0914, 2022 WL 3440701, at *2 (Iowa Ct. App. Aug. 17, 2022); *accord Davis*, 2025 WL 2803725, at *2 ("We doubt *Smith* is good law."). And a commentator recently observed: "The vitality of *Smith* and cases like it is doubtful after *State v. Trane*, in which the [Iowa Supreme] Court noted that it is within the discretion of the court to judge the credibility of witnesses." 4A B. John Burns, *Iowa Practice Series: Criminal Procedure* § 31:2 (2025 ed.) (internal footnote omitted).

There is perhaps an argument that the supreme court has implicitly overruled *Smith* and our court doesn't need to take any further action. But in practice, *Smith* is causing problems. Even after the supreme court heavily criticized *Smith* in *Mathis* and *Trane*, criminal defendants continue to "insist[] it remains controlling law in the absence of an opinion expressly overruling it." *Fisher*, 2025 WL 400511, at *2 (cleaned up); *see also State v. Schondelmeyer*,

No. 14-0621, 2015 WL 1817030, at *3 (Iowa Ct. App. Apr. 22, 2015) (noting the defendant's "claim relies heavily on this court's decision in" *Smith*). And we have to keep writing qualified statements like "[e]ven assuming *Smith* remains good law." *E.g.*, *State v. Veverka*, No. 22-0255, 2023 WL 5949004, at *5 (Iowa Ct. App. Sept. 13, 2023). So, we understand why the State keeps asking us to formally overrule *Smith* rather than dodge the question.[4] Ultimately, we think we should clean up our own case law rather than letting time continue to erode *Smith* as a never-followed and often-criticized decision. We highlight just a few reasons why it's time to formally bury *Smith* and clarify the law going forward.

First and most importantly, the "primary flaw" in *Smith* is a misapplication of appellate standards of review. *See Mathis*, 971 N.W.2d at 518; *Trane*, 984 N.W.2d at 436–37. "[W]e have never permitted appellate courts to masquerade as jurors." *State v. Hagenow*, No. 22-1958, 2024 WL 2042137, at *6 (Iowa Ct. App. May 8, 2024). And credibility questions are reserved for the factfinder, such that we do not reverse criminal convictions because of disagreements over whether testimony was believable. *See Hernandez*, 20 N.W.3d at 507–08. What this court did in *Smith* cannot be reconciled with these fundamental principles of appellate review. *See Trane*, 984 N.W.2d at 436–37.

Second, we think the analysis in *Smith* embraces stereotypes, myths, or other false beliefs about sexual abuse—including an unreasonable expectation that victims of sexual abuse will have perfect memory. "Inconsistencies and lack

---

[4] Exemplar cases citing some of the State's requests include *Showers*, 2024 WL 2317709, at *1; *State v. Atkins*, No. 20-0488, 2021 WL 3895198, at *3 n.4 (Iowa Ct. App. Sept. 1, 2021); and *State v. Cardona*, No. 19-1047, 2020 WL 1888770, at *2 n.1 (Iowa Ct. App. Apr. 15, 2020).

of detail are common in sexual abuse cases and do not compel a [factfinder] to conclude that the victim is not credible or that there is insufficient evidence to support a guilty verdict." *Donahue*, 957 N.W.2d at 11. Particularly with minor victims, "uncertainty or lack of detail from a child witness is no surprise." *State v. Wilde*, 987 N.W.2d 486, 495 (Iowa Ct. App. 2022). As our supreme court said fifty-five years ago: "A person should not be able to escape punishment for such a disgusting crime because he has chosen to take carnal knowledge of an infant too young to testify clearly as to the time and details of such shocking activity." *State v. Rankin*, 181 N.W.2d 169, 172 (Iowa 1970). And as we observed more recently: "We do not require victims of child sex abuse to recall every detail with perfect clarity, and in fact, they rarely do." *Hagenow*, 2024 WL 2042137, at *6. We disapprove of *Smith* and any of its progeny that embrace myths or stereotypes about sexual abuse dynamics.

Third, one plausible reading of *Smith* is that it was a thinly veiled attempt at reviving the corroboration requirement. This is supported by the *Smith* majority's repeated recitations that the "the only evidence against appellant is the statements and testimony of the three girls," that there was no "physical evidence of abuse found in a careful medical examination," that there were no eyewitnesses "other than the girls themselves," and that "no one who was in the room at the time saw or heard anything." 508 N.W.2d at 103–05. Yet Iowa law abandoned the corroboration requirement more than fifty years ago. Iowa Code § 782.4 (repealed 1974). And for good reason: "This requirement for corroborating evidence 'plays on long-held myths that rape victims—and women more generally—cannot be trusted.'" *State v. Barnhardt*, No. 17-0496, 2018

WL 2230938, at *4 (Iowa Ct. App. May 16, 2018) (citation omitted).  The lack of corroboration for victim testimony is irrelevant to a sufficiency analysis, which assumes the jury credited victim testimony absent corroboration.  *Id.*; *see also State v. Knox*, 536 N.W.2d 735, 742 (Iowa 1995) (en banc) ("The law has abandoned any notion that a rape victim's accusation must be corroborated."); Iowa Code § 709.6 (2022); Iowa R. Crim. P. 2.21(3).  And the law neither requires nor expects evidence of physical injury or resistance.  *Cf.* Iowa Code § 709.5 ("Under the provisions of this chapter it shall not be necessary to establish physical resistance by a person in order to establish that an act of sexual abuse was committed by force or against the will of the person.").  We cannot reconcile the language in *Smith* with these principles of black-letter Iowa law.  And we hold that the *Smith* court's decision to reverse convictions in part based on lack of corroboration was clearly erroneous under the law then and now.[5]

Fourth, another plausible reading of *Smith* is that our court conflated a weight-of-the-evidence challenge (which considers credibility and can result in a new trial) with a sufficiency challenge (which does not consider credibility and can

---

[5] We acknowledge some of our unpublished decisions point to corroborating evidence as a reason to distinguish *Smith*.  *See, e.g.*, *State v. Mayes*, No. 19-0252, 2020 WL 2060306, at *6 (Iowa Ct. App. Apr. 29, 2020) ("And, unlike in *Smith*, physical evidence corroborated [the victim]'s allegation."); *Schondelmeyer*, 2015 WL 1817030, at *4 (rejecting sufficiency challenge in part because "[e]ach girl's testimony corroborates the other's"); *State v. Wagner*, No. 01-1232, 2002 WL 1758180, at *8 (Iowa Ct. App. July 31, 2002) (distinguishing *Smith* in part because the victim's "testimony was sufficiently corroborated by other circumstantial and direct evidence in the record").  We recognize this kind of language may have perpetuated the implication that corroborating evidence is required, which is wrong as a matter of law.  So we disavow this and similar language in our case law to the extent it suggests the testimony of a crime victim must or should be corroborated to support a conviction.

result in acquittal with double jeopardy barring retrial). *See State v. Ellis*, 578 N.W.2d 655, 657–59 (Iowa 1998) (on the difference between the two); *Tibbs v. Florida*, 457 U.S. 31, 45 (1982) (explaining how weight-of-the-evidence review is consistent with the Due Process Clause). Or, as the State says more colorfully in its brief, *Smith* may be "a weight of the evidence case dressed in sufficiency clothing." We have acknowledged this possibility before. *Shogren*, 2025 WL 1704077, at *5 n.5. And we find this error also supports formally overruling *Smith*, given the frequent "recurring issue of criminal appellants conflating motions for new trial and motions for judgment of acquittal." *See State v. Moore*, No. 24-0341, 2025 WL 1704319, at *4 (Iowa Ct. App. June 18, 2025) (Buller, J., specially concurring). To the extent *Smith* has contributed to the confusion, we add this to the list of reasons *Smith* should not linger on.

On the other side of the ledger, Lang contends "*Smith* is an important safety valve" for cases where testimony is so unbelievable it is "nothing but a nullity." And he claims, "[t]he State's criticism of *Smith* is exaggerated." We disagree with both premises. Taking the second first, we share most or all of the concerns about *Smith* advanced by the State, as evidenced by the cases cited above from this court and our supreme court. We do not think those opinions exaggerate the flaws in *Smith*. As for the safety-valve argument, that is the function of a district court deciding a motion for new trial—not a motion for judgment of acquittal. *See State v. Jones*, No. 23-2013, 2025 WL 271942, at *3 (Iowa Ct. App. Jan. 23, 2025) ("Rule 2.24(2)(b)(7) is a safety valve, allowing courts to grant a new trial to avoid a miscarriage of justice when the evidence preponderates heavily against the verdict."); *accord Ellis*, 578 N.W.2d at 658–59. To the extent Lang insists *Smith* is

a "safety valve," that too supports us disavowing *Smith* to clarify the safety valve exists in the form of new-trial motions, not sufficiency review.

As a final observation, we note our analysis and ultimate conclusion here do not displace existing supreme court precedent deriving from *Graham v. Chicago & Northwestern Railway Co.*, 119 N.W. 708, 711 (Iowa 1909), in which a witness gave blatantly contradictory testimony at two separate trials. It is not within our power to overrule *Graham* even if we wanted to, though we recognize a fair application of cases like *Hernandez*, *Mathis*, and *Trane* may exclude application of *Graham* in circumstances other than retrial. But that case's modern vitality is for a different court to decide another day.

In short, *Smith* has long overstayed its welcome as controlling precedent. It was wrong when it was decided, and it is wrong now. It has never been followed, and it is irreconcilable with our standards of review as a court for correction of errors at law. Despite this, its problematic holding has persisted in briefing, requiring us to distance ourselves from the decision again and again. We therefore expressly overrule *Smith* and disavow its reasoning for the reasons set forth in this opinion.

## B. Sufficiency of the Evidence

Having overruled *Smith*, we are left with a routine challenge to the sufficiency of the evidence. The core of Lang's complaint is that the factfinder shouldn't have believed Z.S. absent corroboration. "The argument we should reverse because there was no corroborating evidence is a non-starter." *Hernandez*, 20 N.W.3d at 507. So too for Lang's complaint that the court should have believed his denial rather than Z.S.'s account of the abuse (in testimony and

the interview) or the inmate's recitation of his confession. *See id.* at 507–08 ("A criminal defendant is not entitled to acquittal merely because he wishes the jury had believed him instead of the victim."). We decline to substitute our judgment for that of the district court, and we defer to that court's detailed and explicit credibility findings.

In the interest of completeness, and to respond directly to some of Lang's appellate contentions, we observe we would affirm even without the detailed credibility findings made by the district court. We watched Z.S.'s forensic interview and find it compelling—as Lang admitted in his trial testimony. The interview is replete with details beyond the ordinary understanding of a child. And Z.S.'s description of the abuse includes vivid sensory details. The forensic interview was more detailed than Z.S.'s trial testimony, and we tend to agree with the district court's suggested theory why—the courtroom is a scary place for many adults, let alone children, and it is no surprise that a child victim would be more forthcoming in a comfortable room with a trained forensic interviewer than in a sterile, intimidating courtroom filled with lawyers and a judge.[6] And although corroborating evidence was not required, we observe Z.S.'s testimony was strongly supported

---

[6] In addition to the district court's comments we quoted earlier in this opinion, it observed in ruling on the admissibility of the forensic interview that it was not surprised the recording detailed "far more extensive [sex] acts, different types of acts, different levels of specificity of the acts" than Z.S.'s in-court testimony. The court noted:

> When you think about it, that type of testimony is simply not available in court. The courts don't have time to have a child sit with markers and pens and papers and playing with Play-Doh and making the child feel comfortable and allowing all this detail to come out over a lengthy interview. Courts are not set up for that. This interview— this interview was.

We agree and think this point well-said.

by the confession made to the inmate, as well as Lang's post-disclosure conduct that tended to suggest consciousness of guilt. *See State v. Nance*, 533 N.W.2d 557, 562 (Iowa 1995) ("Admissions may be implied by the conduct of the defendant subsequent to a crime when such conduct indicates a consciousness of guilt.").

Given the materially consistent disclosures Z.S. made to her sister, her dad, her dad's girlfriend, the forensic interviewer, and the court, as well as the supporting evidence from the inmate and Lang's admissions and conduct, we reject Lang's contention that Z.S.'s testimony should be rendered a "nullity." We conclude Lang's conviction was supported by substantial, if not overwhelming, evidence.

## IV.    Disposition

We expressly overrule *Smith*, 508 N.W.2d at 102, finding this court misapplied the standards of appellate review and that we cannot permit that decision to shamble on in our case law. And we affirm Lang's convictions as supported by substantial if not overwhelming evidence.

**AFFIRMED.**

Greer, Chicchelly, and Langholz, JJ., concur; Sandy, J., specially concurs; Tabor, C.J., specially concurs with Schumacher, Ahlers, and Badding, JJ., joining.

**SANDY, Judge** (specially concurring).

I write separately because I believe the majority analysis should start and end with the following:

> [T]he "primary flaw" in *Smith*[, 508 N.W.2d 101 (Iowa Ct. App. 1993)] is a misapplication of appellate standards of review. *See*[ *State v.*] *Mathis*, 971 N.W.2d [514,] 518[ (Iowa 2022)]; [*State v.* ]*Trane*, 984 N.W.2d [429,] 436–37[ (Iowa 2023)]. "[W]e have never permitted appellate courts to masquerade as jurors." *State v. Hagenow*, No. 22-1958, 2024 WL 2042137, at *6 (Iowa Ct. App. May 8, 2024). And credibility questions are reserved for the factfinder, such that we do not reverse criminal convictions because of disagreements over whether testimony was believable. *See* [*State v.* ]*Hernandez*, 20 N.W.3d [502,] 507–08[ (Iowa 2025)]. What this court did in *Smith* cannot be reconciled with these fundamental principles of appellate review. *See Trane*, 984 N.W.2d at 436–37.

Judicial minimalism is the judicial philosophy that judges should take the narrowest possible action necessary to resolve a specific dispute, rather than issuing broad, sweeping decisions that create unintended consequences. *See* Cass R. Sunstein, *One Case at a Time: Judicial Minimalism on the Supreme Court* 3–4 (1999). I agree that *Smith* should be overruled simply for the reason stated above.

**TABOR, C.J.** (specially concurring).

I agree with the result reached by the main decision because the testimony of Z.S. provided substantial evidence to support the district court's findings of fact and conclusions of law.

But I disagree with the extra step of overruling a three-decades-old outlier case. Overruling *State v. Smith*, 508 N.W.2d 101 (Iowa Ct. App. 1993), is unnecessary to resolve Lang's appeal. And doing so undermines the due-process review required by *Jackson v. Virginia*, 443 U.S. 307, 316 (1979) (confirming an essential element of due process is "that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense"). Honoring the principle of judicial restraint, I would reject the State's request to overrule *Smith*, as our court has done before. *See State v. Showers*, No. 23-0390, 2024 WL 2317709, at *1 (Iowa Ct. App. May 22, 2024).

To be clear, I agree that *Smith* misapplied the standard and lacked our modern understanding about child sex abuse victims. *See, e.g.*, *State v. Donahue*, 957 N.W.2d 1, 11 (Iowa 2021) ("Inconsistencies and lack of detail are common in sexual abuse cases and do not compel a jury to conclude that the victim is not credible or that there is insufficient evidence to support a guilty verdict.").

Yet my concern with overruling *Smith* is two-fold. First, it's not clear what we're overruling. *Smith* properly recognized that as a rule, "it is for the jury to determine the credibility of witnesses," but applied an "exception" that "[t]he

supreme court established" in its precedents. 508 N.W.2d at 102–03. As far as I can tell, *Smith* doesn't announce a new rule.

Which brings me to my second concern. Are we overstepping our bounds in overruling *Smith*? True, we can overrule our own cases. *See, e.g.*, *In re Marriage of Campbell*, 623 N.W.2d 585, 588 (Iowa Ct. App. 2001). But so can the supreme court. *See, e.g.*, *State v. Kooima*, 833 N.W.2d 202, 210 (Iowa 2013). And when the State recently asked our supreme court to overrule *Smith*, the court declined—instead describing it as "an outlier case" and distinguishing its factual analysis. *State v. Mathis*, 971 N.W.2d 514, 518 (Iowa 2022) ("[U]nlike *Smith*, there are no fatal contradictions or deficiencies in either B.T.'s or L.S.'s testimony.").

Thus, *Mathis* signals that in the rare case where an appellate court did find "fatal contradictions or deficiencies" in a witness's testimony, it could afford the defendant relief. *Id.* That reading of *Mathis* tracks with the observation that Iowa follows an "inherent improbability" standard for evaluating witness credibility. *See State v. Robbins*, 210 P.3d 288, 293−94 (Utah 2009) (listing Iowa among jurisdictions that have adopted that standard and announcing that "[t]o prevent unappealable injustice, we hold that the definition of inherently improbable must include circumstances where a witness's testimony is incredibly dubious and, as such, apparently false").

So, does overruling *Smith* abandon the "inherent improbability" standard as a narrow exception to the rule that appellate courts leave credibility determinations to the factfinder? Assuming it does, is that standard ours to abandon or should such a significant change be reserved for our supreme court? After all, the bedrock cases in *Smith* are supreme court precedents. *See Graham v. Chicago & Nw. Ry.*

*Co.*, 119 N.W. 708, 711 (Iowa 1909) ("This court has gone its full length to protect the right of jury trial against encroachment by the courts under any guise, and one of the rights of jury trial is the right to have the credibility of the witness determined by the jury. Generally speaking there are no limitations upon this rule, but there are limitations upon the application of it. The testimony of a witness may be so impossible and absurd and self-contradictory that it should be deemed a nullity by the court."); *State ex rel. Mochnick v. Andrioli*, 249 N.W. 379, 380 (Iowa 1933) ("The rule that it is for the jury to reconcile the conflicting testimony of a witness does not apply where the only evidence in support of a controlling fact is that of a witness who so contradicts himself as to render finding of facts thereon a mere guess."). These lingering questions underscore the trouble with overruling *Smith*.

Beyond those questions, in my view, the main decision too readily discounts Lang's perspective that *Smith* serves as "a safety valve" available to prevent a miscarriage of justice in rare cases "where a fact-finder convicts on something other than substantial evidence."[7] Indeed, many jurisdictions recognize such a safety valve in sufficiency challenges. *See, e.g.*, *Hillman v. State*, 569 S.W.3d 372, 375–76 (Ark. Ct. App. 2019) ("The victim's testimony, if believed by the trier of fact, is sufficient to establish appellant's guilt. Any inconsistencies in the victim's

---

[7] The main decision suggests that Lang's safety valve would be to challenge the denial of a motion for new trial on weight-of-the-evidence grounds rather than this sufficiency-of-the-evidence review. *See State v. Ellis*, 578 N.W.2d 655, 658 (Iowa 1998). But the possibility of a new-trial challenge does not mean sufficiency review is unavailable where evidence is incredible as a matter of law. *See generally United States v. Larsen*, 427 F.3d 1091, 1094 (8th Cir. 2005) ("Testimony can indeed be incredible as a matter of law . . . ." (internal citation omitted)); *United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012) (explaining that motion for judgment of acquittal may be proper challenge if testimony is "incredible on its face" or "def[ies] physical realities" (citations omitted)).

account of what happened are for the fact-finder to resolve, not our court on appeal. We will disregard testimony that the fact-finder has found credible only if it is so inherently improbable, physically impossible, or so clearly unbelievable that reasonable minds could not differ about it." (internal citations omitted)); *People v. Young*, 105 P.3d 487, 505 (Cal. 2005) ("In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (internal citations omitted)); *People v. Dash*, 104 P.3d 286, 289 (Colo. App. 2004) ("[T]he fact finder, not an appellate court, determines the credibility of witnesses, and only when testimony is so palpably incredible and so totally unbelievable may we reject it as a matter of law. Testimony is incredible as a matter of law when a witness describes events she could not possibly have seen or that are not possible under the laws of nature." (internal quotation marks and citation omitted)); *R.W. v. United States*, 958 A.2d 259, 264 (D.C. 2008) ("Although the determination of credibility is for the finder of fact, and is entitled to substantial deference, the one exception to this general rule is if the testimony of a witness is inherently incredible under the circumstances." (cleaned up)); *Patton v. State*, 43 S.E. 533, 534 (Ga. 1903) ("In testing the sufficiency of evidence this court cannot consider the credibility of the witness; that being a matter exclusively for the jury, who note their manner of testifying, and consider the thousand and one things transpiring during a trial, and which cannot be photographed or transcribed and transmitted to this court as a part of the record. But while it cannot consider the

credibility of a witness, it must consider the nature and character of his testimony—whether it is in accord with natural laws, or is improbable, incredible, or seeks to establish facts which are impossible, or which, if not impossible, must, in their very nature, be uncertain, vague, indefinite, and insufficient to remove reasonable doubts."); *Toles v. State*, 151 N.E.3d 805, 808 (Ind. Ct. App. 2020) ("We do not judge witness credibility. There is only one exception to this rule: the incredible-dubiosity doctrine, under which we can impinge upon a factfinder's responsibility to judge the credibility of the witnesses when the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it." (internal quotation marks and citation omitted)); *State v. Hamdan*, 131 So. 3d 197, 204 (La. Ct. App. 2013) ("In our review, we are highly deferential to the trier of fact. Thus, we assume that the jury can accept as true the testimony alone of any witness, even a single witness. We will *only* tread on a jury's presumed acceptance of a witness' testimony when the testimony is implausible or clearly contrary to documentary evidence." (internal citations omitted)); *People v. Delamota*, 960 N.E.2d 383, 387 (N.Y. 2011) (recognizing that the appellate court can reverse convictions "in rare cases where the charged crime is established by only one witness who provides inherently contradictory testimony at trial"); *State v. Hornsby*, 858 S.W.2d 892, 894 (Tenn. 1993) ("The so-called physical facts rule is the accepted proposition that in cases where the testimony of a witness is entirely irreconcilable with the physical evidence, the testimony can be disregarded." (internal quotation marks and citation omitted)); *State v. Dever*, 508 P.3d 158, 165 (Utah Ct. App. 2022) ("Appellate courts are not normally in the business of reassessing or reweighing evidence, and conflicts in the evidence are typically

resolved in favor of the jury verdict. However, because a conviction not based on substantial reliable evidence cannot stand, our supreme court has carved out a narrow exception to this general rule, under which a court may disregard witness testimony as inherently improbable when determining if sufficient evidence exists to sustain a conviction." (internal quotation marks and citation omitted)); *State v. Schmidt*, 884 N.W.2d 510, 516 (Wis. Ct. App. 2016) ("This court will only substitute its judgment for that of the trier of fact when the fact finder relied upon evidence that was inherently or patently incredible—that kind of evidence which conflicts with the laws of nature or with fully-established or conceded facts." (internal quotation marks and citation omitted)).

As all these jurisdictions envision, only the extremely rare case would fall into the exception. So deference to the factfinder will continue to dominate our sufficiency reviews, as it has in the decades since *Smith*.

To sum up, I would affirm because substantial evidence supports the verdict and *Smith* can be easily distinguished. But I would leave *Smith* intact. Whether to overturn *Smith* or to disavow the precedents that underlie it is the prerogative of the supreme court.